CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

MAY 2 5 2006

JOHN F CORCORAN, CLERK
BY: K. Dotson
DEPUTY CLERK

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### HARRISONBURG DIVISION

| | | |
|---|---|---|
| DONNA K. HARRIS, | ) | |
| | ) | |
| Plaintiff | ) | Civil Action No. 5:05CV00065 |
| | ) | |
| v. | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of Social Security | ) | By:  Hon. James G. Welsh |
| | ) | United States Magistrate Judge |
| Defendant | ) | |

Plaintiff, Donna K. Harris, brings this action pursuant to 42 U.S.C. § 405(g) challenging a final decision of the Commissioner of the Social Security Administration ("the agency") denying her claim for a period disability insurance benefits ("DIB") under Title II of the Social Security Act, as amended, ("the Act"), 42 U.S.C. §§ 416 and 423.  Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g).

By order of referral entered January 20, 2006, this case is before the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  On the same date, the Commissioner filed her Answer and a certified copy of the Administrative Record ("R."), which included the evidentiary basis for the findings and conclusions set forth in the Commissioner's final decision.

In her motion for summary judgment, filed on February 20, 2006, the plaintiff argues that the Commissioner's decision is not supported by substantial evidence for two reasons.  It is her

contention that the adverse decision of the administrative law judge ("ALJ") was based on his flawed consideration of significant medical evidence, particularly her need for back surgery, and on the ALJ's reliance on vocational testimony given in response to an incomplete hypothetical question. On March 22, 2006, the Commissioner filed her motion for summary judgment and supporting memorandum. Therein, the Commissioner argues that substantial evidence supports the ALJ's decision, that plaintiff engaged in symptom "magnification, and that her "deceit," not an absence of insurance approval, has been the cause of her multi-year failure to undergo recommended back surgery. No request was made for oral argument.[1] The undersigned having now reviewed the administrative record, the following report and recommended disposition is submitted.

## I.    Standard of Review

The court's review is limited to a determination as to whether there is substantial evidence to support the Commissioner's conclusion that the plaintiff failed to meet the conditions for entitlement established by the Act and applicable administrative regulations. If such substantial evidence exists, the final decision of the Commissioner must be affirmed. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990); *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

"Under the  . . .  Act, [a reviewing court] must uphold the factual findings of the [Commissioner], if they are supported by substantial evidence and were reached through application of the correct legal standard. " *Mastro v. Apfel*, 270 F3d 171, 176 (4th Cir. 2001) (quoting *Craig v.*

---

[1] Paragraph 2 of the court's Standing Order No. 2005-2 directs that a plaintiff's request for oral argument in a Social Security case, must be made in writing at the time his or her brief is filed.

2

*Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). This standard of review is more deferential than *de novo*. "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Mastro v. Apfel*, 270 F.3d at 176 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642). "In reviewing for substantial evidence, [the court should not] undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." *Id.* (quoting *Craig v. Chater*, 76 F.3d at 589). The ALJ's conclusions of law are, however, not subject to the same deferential view and are to be reviewed *de novo*. *Island Creek Coal Company v. Compton*, 211 F.3d 203, 208 (4th Cir. 2000).

## II.  Administrative History

The record shows that plaintiff filed her application for DIB on or about September 18, 2003,[2] alleging disability as of May 8, 2001, on the basis of a back injury and breast cancer. (R.80,96). Her claims were denied, both initially and on reconsideration. (R.51-53,58-60). Pursuant to her timely request, an administrative hearing on her applications was held on March 24, 2005 before an ALJ. (R.26-48). At the hearing, the plaintiff was represented by counsel. (R.26-48).

---

[2] Plaintiff's protected filing date is August 25, 2003. (R.80).

3

Utilizing the agency's standard five-step inquiry,[3] the plaintiff's claim was denied by written administrative decision on June 23, 2005. Although the evidence suggested gainful work activity by the plaintiff after her alleged disability onset date, the ALJ concluded that it was "insufficient" to permit a step-one finding of substantial gainful work activity. (R.12,21).

At step-two the ALJ concluded that the medical evidence established plaintiff's back impairment imposed significant, vocationally relevant, limitations and was, therefore, a "severe" impairment[4] within the meaning of the Act. (R.16,21). Based primarily on the medical evidence showing the successful treatment of plaintiff's cancer of the right breast and the absence of any claim of resulting functional limitation, the ALJ concluded that plaintiff's post-mastectomy status was not a severe impairment. (R.16). Similarly, at step-two the ALJ also concluded that the evidence did not establish a severe mental impairment. (R.16).

---

[3] Determination of eligibility for social security benefits involves a five-step inquiry. *Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001). It begins with the question of whether the claimant engaged in substantial gainful employment. 20 C.F.R. § 404.1520(b). If not, step-two of the inquiry requires a determination of whether, based upon the medical evidence, the claimant has a severe impairment. 20 C.F.R. § 404.1520(c). If the claimed impairment is sufficiently severe, the third-step considers the question of whether the claimant has an impairment that equals or exceeds in severity one or more of the impairments listed in Appendix I of the regulations. 20 C.F.R. § 404.1520(d); 20 C.F.R. Part 404, subpart P, App.I. If so, the claimant is disabled; if not, step-four is a consideration of whether the claimant's impairment prevents him or her from returning to any past relevant work. 20 C.F.R. § 404.1520(e); 20 C.F.R. § 404.1545(a). If the impairment prevents a return to past relevant work, the final inquiry requires consideration of whether the impairment precludes the claimant from performing other work. 20 C.F.R. § 404.1520(f).

[4] Quoting *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984), the Fourth Circuit held in *Evans v. Heckler*, 734 F.2d 1012, 1014 (4th Cir. 1984), that "an impairment can be considered as 'not severe' only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience.'" *See also* 20 C.F.R. § 404.1520(c).

4

At step-three, the ALJ determined that plaintiff's impairment neither met nor was medically equivalent to an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R.17,21). In particular, he concluded that the plaintiff's impairment neither met nor equaled the criteria of Listing 1.00 (musculoskeletal impairments), and he noted that no treating or examining physician had mentioned findings equivalent to the criteria in any listed impairment. (R.17).

After further concluding that plaintiff's claimed symptoms and limitations were not fully supported by the evidence, the ALJ found that the plaintiff retained the exertional ability to perform "a wide range of work at the sedentary level of exertion." (R.19). Although work at this exertional level would not permit her to perform any of her past relevant work, the ALJ determined that an individual with plaintiff's vocational profile and limitations (including: no prolonged sitting or standing, an ability to change positions as needed for comfort, no lifting more than twenty pounds, no repeated bending or twisting, and the option to sit or stand as needed for comfort) could perform the requirements of a number of jobs existing in the national economy, including work as a receptionist, information clerk, and order clerk. (R20).

After the ALJ's issuance of his adverse decision, plaintiff made a timely request for Appeals Council review. (R.370-371). This request was subsequently denied (R.4-6), and the ALJ's unfavorable decision now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981.

5

## III.    Facts

In her application, plaintiff alleged two discreet medical conditions, breast cancer and a back injury, that limited her ability to work. (R.96). Her medical records document her receipt of specialized medical treatment for both conditions, as well as treatment by her primary care physicians for a number of routine illnesses which responded to appropriate medications. (*See* R.149-169,183-193,210-275,337-343,345-360,363-369).

### A.    Primary Care

Between May 2001 and April 2004, the plaintiff was treated by her primary care physicians at Carilion Family Medicine – Weyers Cave (Drs. Showalter, Buckwalter and Weirich) for multiple, generally minor, medical complaints, including rashes, abdominal pains, hot flashes, back and hip pains, situational anxiety, episodic vertigo, headaches, colds, sleep difficulties, head congestion, nausea, chest pains, generalized weakness, depression, urinary frequency, a fungal infection of a toe, sinusitis, coughs, and a sore throat. (R.210-275, 288-297,312-313; *see also* 314-332). Although she occasionally presented with complaints of low back and related pains to her primary care physicians,[5] medical management of her back-related problems was by orthopaedic specialists at

---

[5] The records of plaintiff's primary care physicians document approximately thirty office visits over a thirty-one month period, and a complaint of low back pain is noted on only six occasions: May 2001, October 2001, April 2003, September 2003, February 2004, and March 2004. (R.274-275,260-261,246,235-236,221-223,212-213). Plaintiff's Rockingham Memorial Hospital records also show an emergency room visit on April 15, 2004 with complaints of low back pain. (R.362).

6

Augusta Orthopaedic (Dr. Lee Hereford)[6] and at Hess Orthopaedic (Dr. R. C. Kime). (R.147-148,183-193,345-258, 364-369).

## B.    Oncology Care

Following abnormal results from a screening mammogram in October 2001, the plaintiff was diagnosed and successfully treated at Rockingham Memorial Hospital's Regional Cancer Center ("RMH-RCC" or "cancer clinic") for a small, grade III, ductal carcinoma of the right breast. (R.149-182,276-288-307,310-311). As her treatment option, the plaintiff elected to have a mastectomy,[7] followed by eight cycles of chemotherapy[8] and by right chest wall radiation therapy. (R.286-287,284,158-169,156,157). After surgery, the plaintiff's condition and treatment regime were actively monitored by medical personnel at the cancer clinic. (R.153-169). Their assessment was that the plaintiff tolerated both the surgery and her follow-up treatment reasonably well. (*Id.*). At the end of her treatment, no evidence of any cancer recurrence was found, and the plaintiff's continuing care was transferred to the medical oncology department in late September 2002. (R.153).

At the time she was initially seen by the medical oncology internist, the plaintiff was again found to be doing "remarkably well" and to show no evidence of disease progression. (R.284). Her

_____

[6] On referral by Dr. Hereford for management of her back pain, the plaintiff was also seen at the RMH Center for Corporate Health on six occasions between September 23, 2003 and May 11, 2004. (R.3435-358).

[7] A right modified radical mastectomy was performed at Rockingham Memorial Hospital on December 18, 2001. (R.149-152).

[8] The last chemotherapy dose was given on June 4, 2002. (R.280).

7

medication regime, calcium and Tamoxifen (adjuvant therapy to reduce the risk of any disease recurrence), was continued without change. (R.284). Medical Oncology's subsequent office notes similarly indicate that the plaintiff continued to do well, although a note dated February 2003 indicated that she was having some problems with breast pain of unknown etiology. (R.282-283). Similarly, an office record in September 2003 reported that she continued to have occasional chest pain; in addition it noted that she attributed her back pain to a back injury two years previously. (R.280-281). A follow-up chest X-ray[9] and a bone scan both "looked fine" and showed "no evidence of any metastic disease."[10] (R.279,278). The office note of April 13, 2004 also reconfirmed that the plaintiff was "doing well" and showed "no clinical evidence of disease." (R.276)

## C.    Orthopaedic Care

Although the plaintiff's orthopaedic-related records before July 2001 are limited, they show that she was treated by Dr. Lee Hereford in 1998 for low back discomfort and was diagnosed, pursuant to an August 1998 lumbar MRI, to have several degenerative changes in her low back, including "mild degenerative changes" in the L3-4 and L5-S1 disc spaces, some scoliotic changes in the L4-5 facet joints and a "small broad-based" central disc herniation at L4-5 which appeared to have healed with conservative management. (R.192,342-343). After a three-year period, during which she had "done well," the plaintiff returned to Dr. Hereford 0n July 24, 2001 for treatment of renewed back pain with attendant rediculopathy which she attributed to a work-related injury on May

---

[9]    More recent screening mammography, in April 2003 and again in April 2004, has continued to show no evidence of any new abnormalities. (R.292,277).

[10]   The same studies additionally demonstrated that plaintiff's lumbar disc degeneration remained unchanged from December of the previous year. (R.278).

8

8, 2001.[11] (R.192-193). On clinical examination, the plaintiff showed pain on straight leg raising at ninety degrees, and X-rays showed a muscle spasm. (*Id.*). Except for the fact that the plaintiff seemed to be "somewhat laughing," the examination, it was otherwise unremarkable. (*Id.*). She was given a prescription for Lortab; CT mylogram was ordered, and the plaintiff's light duty status was continued. (*Id.*).

Subsequent MRI studies on June 5 and August 9, 2001 demonstrated essentially the same lower lumbar disc disease shown in the 1998 MRI; however, the August study also suggested some impingement of the L3 and L5 nerve roots on the left.[12] (R.340,341,308-309).

Between August 21 and November 15, 2001, Dr. Hereford saw the plaintiff on five additional occasions. Following completion of the August lumbar MRI, he described the amount of nerve root compression to be "great . . . but overall . . . very minor." (R.191). He placed her on Vioxx samples and prescribed steroid injection therapy. (R.191). After the first epidural steroid treatment, in September the plaintiff reported that she had experienced a complete resolution of her

---

[11] Following her back injury, Dr. Hereford's July 24, 2001 office record notes that the plaintiff was initially seen at HealthSouth, that X-rays demonstrated "normal structures, and that she was treated conservatively (three weeks physical therapy and "muscle relaxers." (R.192). Plaintiff's work-related back injury and a diagnosis of "pulled muscle"are also noted in her primary care physician's May 14, 2001 office record. (R.274-275). On the same date, her primary care physician found the plaintiff to have "fairly typical and moderately severe trigger [points] . . . in the neck and shoulder area" which he thought could be "possibly secondary to the low back sprain and poor sleep habits." (R.274).

[12] The same degenerative disc disease was also demonstrated by a whole-body bone scan in December 2001 prior to plaintiff's cancer surgery (R.297,286), and when repeated in September 2003, the bone scan results were "essentially unchanged." (R.288).

radicular symptoms but continued to have low back pain. (R.190). She was continued on the previous light work restriction[13] and was referred for physical therapy. (R.190). In an apparent contradiction of what she had previously told Dr. Hereford, three weeks after the second steroid injection the plaintiff reported that she had obtained no great relief as a result of either injection. (R.189).

In October, after conservative treatment measures had failed to resolve her low back pain, Dr. Hereford suggested surgical decompression; the plaintiff, however, declined this treatment option. (*Id*.). Consequently, conservative orthopaedic care, including physical therapy and initiation of a steroid drug (prednisone) regime, was continued. (*Id*.). When seen by Dr. Hereford at the end of October 2001, the plaintiff reported that she could not tolerate the prednisone due to gastrointestinal distress and an inability to sleep[14] and that physical therapy made her condition worse. (R.187).

---

[13] From plaintiff's medical records, it appears that McQuay, her pre-injury employer, did not have any "light work" jobs available for the plaintiff and that she never worked for this employer after the injury date.

[14] In contrast, an October 20, 2001 office record of her primary care physicians notes that she reported recently having tapered off a course of prednisone and was attributing a rash, itching and recent headaches to the prednisone. (R.270). Similarly, an October 25, 2001 office record of her primary care physicians reports that her low back pain had been "going on for a few days" and that the pain had occurred "in the context" of moving and sleeping on the sofa for "the last couple of weeks." (R.260).

After being effectively off-work for five months,[15] after failing to respond to conservative treatment (physical therapy, steroid injections and oral steroids) and after refusing surgical treatment,[16] Dr. Hereford opined that he had "very little to offer otherwise." (R.188). Although the plaintiff agreed two weeks later to proceed with surgery (R.188), it was cancelled due to the breast cancer diagnosis and subsequent treatment. (R.185; *see also* R.184).

For the next year, the plaintiff did not seek any medical treatment for her back complaints. When she did return to see Dr. Hereford in September 2002, she told him that she was about to complete her breast cancer therapy and had been told by her oncologist not to have an non-emergency surgery for the next four to five years "due to the possible flare up of the cancer." (R.185). In direct contradiction of this representation to Dr. Hereford, a cancer clinic note, dated August 8, 2002 (one month earlier) records that she had been told explicitly that "nothing about operating on her back that [would] make the cancer come back."[17] (R.155).

On examination in September 2002, Dr. Hereford noted limited low back flexibility due to back spasm and leg pain; he noted "markedly positive" pain responses in the lumbar and buttocks, and he recorded her unwillingness to attempt straight leg raising to forty-five degrees. (R.185). In addition, he noted his finding that the plaintiff "markedly over exaggerated pain over the left

---

[15] See footnote 13.

[16] Dr. Hereford also noted on October 30, 2001 that surgical decompression had been "approved" by the Workers Compensation carrier. (R.188).

[17] During the same August 2002 cancer clinic visit, the plaintiff reported that her back was doing better. (R.155).

11

[buttock] and left leg region," that she had reached maximum medical improvement without surgical intervention, that she needed to return only on an as needed basis, and that she was able to engage in sedentary work activity. (R.185-186).

Although she saw her primary care physicians with a low back and related pain complaint on one occasion in April 2003,[18] the plaintiff did not again seek any orthopaedic treatment until late August 2003. On that occasion, she presented with complaints of severe low back and redicular pain. (R.183). Once again, Dr. Hereford suggested surgery, and the plaintiff said that she would check with her oncologist "to see if it is okay." (*Id.*). The medical records fail to indicate that she ever checked with her medical oncologist or with any other health care provider.

When she saw her primary care physicians approximately two weeks later, the plaintiff complained "a lot of 'really bad' back pain over the last two years" and in addition complained that Dr. Hereford would not give her any kind of pain medication. (R.235). On that occasion, her primary care physicians, likewise, prescribed no medication for her back pain, and they recommended that she maintain contact with Dr. Hereford for her back and leg problems. (*Id.*). By copy of the office note Dr. Hereford was apprised of her expressed concern. (*Id.*).

---

[18] The office records of plaintiff's primary care physicians show that on April 1, 2003 she presented with complaints of back and leg pain of two weeks duration. (R246). On examination she was found to have straight leg raising "somewhat limited on the left," to have "some discomfort" in the left buttock, and to have a "good bit of pain" in the right hip and low back. (*Id.*). Naproxen was prescribed for the hip pain of "unclear" etiology. (*Id.*).

12

Shortly thereafter, on referral by Dr. Hereford, management of plaintiff's back pain was transferred to RMH Center for Corporate Health (Dr. Stephen Phillips). (R.359). On his initial examination and evaluation, Dr. Phillips noted that the plaintiff complained of bilateral pain in the lumbar region with radiation of the pain into her hips (*Id*.). She told him that her medical oncologist was "in the process of making sure" that her back pain was not caused by metastic breast cancer.[19] (*Id*.). He noted that the plaintiff was in no acute distress, was able to stand without apparent difficulty, moved "briskly," and could heel and toe walk without difficulty. (R.360). He found no back spasm and no lower extremity atrophy; he found her ability to raise her legs and her lower extremity reflexes to be normal, and he found her to be hypersensitive to light palpation and touch which suggested to him "evidence of symptom magnification." (*Id*.).

Three weeks later, the plaintiff complained to Dr. Phillips of pain in her mid and upper back, and on examination he again noted that she exhibited "greatly exaggerated" pain behaviors, and he recorded the fact that she told him she did not want to have back surgery. (R.356-357). It was Dr. Phillips' opinion that the plaintiff should be encouraged to return to work with exertional and postural restrictions.[20] (R.357).

Dr. Phillips subsequently saw and examined the plaintiff in December 2003, in January 2004, and in May 2004. On each occasion, he found "significant," "obvious" and "a great deal of"

---

[19] This assertion by the plaintiff is not supported (and in fact appears to contradict) her relevant oncology-related medical records. (*See e.g.* R.278-283).

[20] "No prolonged sitting or standing if painful. Change position as needed. No lifting over 20 pounds. No repeated bending or twisting if painful." (R.357).

13

symptom magnification, and in January he noted that the plaintiff's pain complaints were "in a non-anatomical distribution." (R.354,350,346). Dr. Phillips prescribed Celebrex for her pain, but she stopped taking it because it made her "feel strange." (R.354, 350). When Dr. Phillips saw the plaintiff for the final time in May 2004,[21] she reported that the oncologist had approved[22] her having back surgery, and Dr. Phillips recommended that she continue to work and schedule an appointment with Dr. Hereford. (R.346,345).

Instead of following-up on this recommendation, the plaintiff apparently decided to start, but not to complete, a new series of physical therapy sessions. This undertaking was terminated, when she cancelled previously scheduled appointments on August 23 and 24, 2004. (R344). When being observed during these physical therapy sessions, it was noted that the plaintiff's ambulation was typically slow and unsteady; however, her ability to walk appeared to be significantly better when she was in the parking lot or on the track. (*Id.*). Not surprisingly, the physical therapist also "questioned" symptom magnification by the plaintiff. (*Id.*).

---

[21] In connection with this final treatment and examination by Dr. Phillips, there is no indication in his office note that the plaintiff apprised him of an injury to her back descending some steps in January 2004 (R.221), of her subsequent constant back pain over a two-week period for which her primary care physicians prescribed Vioxx on February 4, 2004 (R.221-223), and of the subsequent exacerbation of her pain despite the medication regime (R.212). Likewise, Dr. Phillips was apparently not apprised of her April 15, 2004 emergency room visit seeking pain medication for low back pain and for which she was given Demerol and Phenergan by intramuscular injection and given prescriptions for Percocet and Valium. (R.325-332,362).

[22] The oncologist's letter (dated May 11, 2004, addressed "To Whom It May Concern,"given to the plaintiff on May 12, 2004, and signed by Dr. Brian Robinson) states that orthopaedic surgery is in no way contraindicated from the standpoint of her previous malignancy. (R.333).

14

The administrative record contains no indication that the plaintiff sought any further treatment for her complaints of back pain until she saw a nurse practitioner at Hess Orthopaedic, on December 21, 2004 and for a second time on January 11, 2005. (R.367-369). She gave a medical history to the nurse practitioner which included having had back pain for three years related to a work injury and having had physical therapy "about a year ago" which had made her pain worse. (R.268). The nurse practitioner noted that the plaintiff stood normally and could walk on her heels and toes, but had a limp when she walked. (*Id.*). After a new lumbosacral MRI study, surgical intervention was suggested by the nurse practitioner, and with the plaintiff's agreement, a surgical evaluation with Dr. Richard Kime was scheduled. (R.367). At this time the plaintiff was given a note by the nurse permitting her to work with restrictions[23] and a prescription for Darvocet, as needed, for pain. (*Id.*).

In addition to giving a medical history of having injured her back at work pulling a piece of sheet metal several years previously, of having been referred to Dr. Hereford, of having been told she had a herniated disc and of having been scheduled for surgery before being diagnosed with breast cancer, the plaintiff told Dr. Kime that she had originally been told that back surgery might require pins and rods and that since her cancer treatment Dr. Hereford had declined to operate.[24] (R.364). As part of the history obtained by Dr. Kime, the plaintiff also reported that she was working four days per week as a sales and stock clerk at the Family Dollar Store. (*Id.*).

---

[23] "[N]o lifting, pushing or pulling greater than 15 lbs. until seen for surgical evaluation . . . on 2/4/05." (R.367).

[24] Neither of these two assertions by the plaintiff is supported (and in fact appears to contradict) her relevant medical records. (*See e.g.* R.187-188,339,183,338,337).

15

Based on the new MRI study and his examination, Dr. Kime concluded that the plaintiff had multilevel degenerative disc disease, an L4-5 disc herniation with attendant nerve impingement, and L4-5 facet joint disease with attendant neurologic compression. (R.365). In his opinion, surgical repair of this L4-5 spinal instability would require an L4-5 laminectomy, a bilateral l4-5 facetectomy, and an L4-5 diskectomy followed by anterior and posterolateral column fusions. (R.365-366).

Despite this early 2005 surgical recommendation by a second orthopaedic surgeon, the administrative record contains no indication that the plaintiff, in fact, has had surgery to repair her lumbar disc disease.

### D.    Consultive Examination and Functional Capacity Assessment

During the administrative consideration of plaintiff's disability claim, she was examined by Dr. M. Matthew[25] on January 12, 2004. (R.194-201). As part of her medical history, the plaintiff told Dr. Matthew that her chronic back pain was relieved by laying-down and by using Tylenol. (R.195). On clinical examination, he found the plaintiff to be in no acute distress, to have no lower extremity weakness or atrophy, to have full cervical range of motion, to exhibit normal strength, and to exhibit tenderness and a significantly reduced lumbosacral range of motion. (R.196-200). By X-ray, Dr. Matthew also confirmed plaintiff's degenerative lumbosacral disc disease. (R.201).

---

[25] Dr. Matthew is Virginia state agency physician with a specialty in Physical Medicine and Rehabilitation. (R.336).

A subsequent, and detailed state agency physical capacity assessment was done by Dr. Luc Vinh.[26] Based on his review of the record, he concluded that the plaintiff's subjective complaints of back pain were "partially credible. (R.207). In his opinion the plaintiff retained an exertional ability to lift ten pounds occasionally, lift less than ten pounds frequently, to stand or walk at least two hours during a normal work day, and to sit approximately six hours during a normal work day. (R.203). Additionally, he concluded that the plaintiff had postural limitations which permitted only occasional climbing, bending, stooping, kneeling, crouching or crawling. (R.204). In compliance with his regulatory obligations, Dr. Vinh's opinions and conclusions of concerning plaintiff's impairments and her residual functional abilities were also considered by the ALJ as part of the decision-making process. *See* 20 C.F.R. § 404.1527(f).

### E. *Hearing Testimony*

At the administrative hearing in March 2005, the plaintiff testified that she was then nearly forty-eight years of age.[27] (R.29). She testified that she has a high school education and in the past that she had worked as a welder and as the operator of a metal shearing machine. (R.29,41) *See* 20 C.F.R. §§ 404.1564, 416.964. She stated that she since November 2004 she had been working at a Family Dollar Store as a cashier. (R.32,34,39). She testified that the job required her to stand all of the time and that she was currently working only seven hours each week. (R.32,34). From March

---

[26] Dr. Vinh is a Family Physician, not in active practice. (R.335)

[27] At this age she is classified as a "younger worker" under 20 C.F.R. § 1563(a).

Case 5:05-cv-00065-SGW-JGW   Document 13   Filed 05/25/06   Page 17 of 27   Pageid#: 60

to September 2004, she stated that she had worked fifteen hours per week at a movie gallery (R.39; however, "the doctors made [her] leave" and wrote "a note" saying she "needed a sit down job."[28] (R.39-40).

Following her work-related injury on May 8, 2001, the plaintiff testified that Dr. Hereford was the first orthopaedist she saw. (R.32). She had discussed surgery with him, but it had been postponed due to the breast malignancy and subsequent treatment. (*Id.*). She stated that her cancer was now in remission, that she had recently gone to see Dr. Kime, and was waiting for insurance company approval before having the surgery. (R.32-33).

The plaintiff also testified that she could drive a car but found it difficult to sit for any extended period, that sitting on her right hip decreased her pain, that three-hours work left her feeling "terrible," that her daughters helped her with the heavy housework, and that she took care of herself and fixed her own meals on a daily basis. (R.30,36,33-35). She described her pain as a "constant" low back pain which radiated into her left leg. (R.37).

Earl Glosser, a vocational expert, was also present at the administrative hearing. (R.41-47). In terms of exertion and skill levels, Dr. Glosser described plaintiff's past work as a shear machine operator to be semi-skilled and heavy in exertional level, her past work as a veneer glue operator to be semi-skilled and medium in exertional level, and her past work as a welder to be skilled and

---

[28] These two statements by the plaintiff do not appear to be supported (and in fact appear to contradict) her relevant medical records. (*See e.g.* R.345-346,344,337).

18

medium in exertional requirements. (R.41-43). In his opinion the skills required for her past relevant work were job specific and not transferable. (R.42-43).

Dr. Glosser was asked to identify work activity that could be done by a hypothetical individual who was assumed to be of plaintiff's age, education and work history, who could do work with a sit/stand option,[29] required no prolonged sitting or standing, required lifting of no more than twenty pounds, and required no repeated bending or stooping. (R.43-44). In response, Dr. Glosser testified that such an individual could perform a number of entry level, sedentary jobs in the national economy, including work as a receptionist or an information clerk. (R.44-45). Asked to assume further that such a hypothetical individual could lift a maximum of ten pounds, only occasionally climb, balance, etc., stand or walk only a total of two hours during a normal work day and to sit no more than six hours during a normal work day, Dr. Glosser testified that such an individual would still be able to do the work he had previously identified. (R.45-46). When asked on cross-examination, whether an individual with the additional restriction that they had to walk "around a larger area" could do any of the jobs that he had identified, Dr. Glosser opined that such an individual could not do the work "if she had to take a hike. (R.46-47)

## IV.    Analysis

As previously stated herein, the plaintiff argues in her appeal that the ALJ's step-five non-disability determination was predicated on a "flawed consideration" of the "significant medical

---

[29] The opportunity to change positions during the performance of work activity is typically described as the "sit/stand option" or sit/stand limitation." *See Gibson v. Heckler*, 762 F.2d 1516, 1518(11th Cir. 1985).

evidence" documenting her need for back surgery and on vocational testimony given in response to an incomplete hypothetical question. In the opinion of the undersigned these contentions are without merit.

### A.    Failure to Consider Medical Evidence

As grounds for reversal, the plaintiff's core contention is that the ALJ did not afford proper weight to Dr. Kime's orthopaedic opinion (R.364-366) that surgical intervention was medically indicated due to her significant degenerative disc disease. As support for this position, the plaintiff points to the ALJ's statement that she "ha[d] not required surgery" (R.18). This argument, however, ignores the context within which the ALJ's observation was made.

Pursuant to his obligation to evaluate the effect of her pain on her functional ability, to make express credibility findings and to state his reasons for those findings in accordance with *Craig v. Chater*, 76 F.3d 585 (4th Cir. 1996), the ALJ carefully reviewed the medical evidence and found that it did not support the disabling degree of pain the plaintiff claimed and that it "detract[ed] from her credibility." (R.17-18). He first noted that the plaintiff had in fact worked at several jobs after her alleged May 8, 2001 disability onset date, and he then reviewed the relevant medical evidence and determined that it did not support the severity and frequency of symptoms and limitations claimed by the plaintiff. (*Id.*). *See Myers v. Califano* 611 F2d. 980 (4th Cir 1980); 20 C.F.R. § 404.1529; Soc. Sec. R. 96-7p. *See also Craig v. Chater*, 76 F.3d 585, 591-96 (4th Cir. 1996).

20

Weighing the plaintiff's testimony about the severity and frequency of her symptoms and limitations, the ALJ concluded that it was inconsistent with her "routine and conservative" medical treatment, that it was inconsistent with her "limited" and non-surgical orthopaedic care, that it was inconsistent with her intermittent need for any prescription pain medication, that it was inconsistent with her failure to attend scheduled medical appointments for injections and for physical therapy sessions, that it was inconsistent with her "greatly exaggerated" pain and presentation behaviors, that it was inconsistent with her observed behaviors by the physical therapist, and that it was inconsistent with certain of her prior statements. (*Id.*). These findings are fully supported by the administrative record, and they are in full accord with the credibility evaluation mandated by Soc. Sec. Ruling 96-7p.

In the context of this credibility determination, the ALJ's observation that the plaintiff had not required surgery is both logical and fully supported by substantial evidence. *See Craig v. Chater*, 76 F.3d at 589) ("Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls to the ALJ.") (internal quotation marks omitted).

Following her 2001 back injury and a failed response to a period of conservative therapy, Dr. Hereford recommended surgery in the Fall of the same year. (R.188,190). In August of the next year, following successful breast cancer treatment, she was told by her oncologist that the previously scheduled back surgery would not cause any cancer recurrence. (R.155). Nevertheless, she falsely represented to Dr. Hereford that the oncologist had told her not to have elective back surgery for the

21

next four or five years because it could make her cancer "flare up." (R.185). After the passage of a second year without any significant treatment of her low back pain, in August 2003 Dr. Hereford renewed his surgical recommendation. (R.183). Despite promising to check with her oncologist "to see if [surgery was] okay," she did not do so for another nine months. Even when she belatedly did so and received the medical oncologist's written approval, she made no effort to follow-up on Dr. Phillips' recommendation that she schedule an appointment with Dr. Hereford. (R.333,345-346). Instead, the plaintiff delayed for another seven months before seeking any further orthopaedic-related care, and it was less than two months before her scheduled disability hearing that she was examined by an orthopaedist and conditionally agreed to lumbosacral surgery. (R.365-369).

Given this history, the ALJ's finding that a lack of any surgical intervention impaired plaintiff's credibility was both reasonable and compelled by a preponderance of the evidence.

In passing, it also merits mention that the plaintiff's claim of disability in this case is, at its core, argument that she is entitled to a period of disability insurance benefits for a condition for which she has declined or delayed treatment on multiple occasions. Such a position defies both law and logic. Neither this plaintiff nor anyone "[should] expect to receive disability benefits on the basis of a condition for which [she] refuses reasonable medical treatment." *See generally Bradds v. Barnhart*, 2006 WL 757663, *6 (W.D.Va.) (*Citing* 20 C.F.R. §§ 404.1530, 416.930).

### B. Reliance on Vocational Testimony Based
### On a Flawed Hypothetical Question

As her second contention on appeal, the plaintiff argues that the hypothetical questions posed to the vocational witness did not fully describe her exertional impairments, because it did not include a recognition of the inherent limitations imposed by disc disease of such severity that significant invasive surgery is medically indicated.

As the Fourth Circuit has recently held, an ALJ's hypothetical question can be impeached only if it does not "adequately reflect" the substantial evidence of a plaintiff's functional capacity. *Johnson v. Barnhart*, 434 F.3d 650, 659 (4th Cir. 2005). Moreover, the applicable case law gives the ALJ a measure of discretion in his articulation of what an individual can and cannot do. *See Johnson v. Barnhart*, 434 F.3d at 659; *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). Judged by this standard, the plaintiff's second argument also fails.

In the case now before the court, the ALJ posed two hypothetical questions to the vocational witness. In each instance, the witness was asked to assume an individual with the plaintiff's vocational characteristics. (R.43-45). Consistent with the exertional limitations outlined by Dr. Phillips in 2003 (R.357) and more restrictive than the sedentary work restriction[30] outlined by Dr. Hereford in 2001 (R.185-186), the ALJ's first hypothetical included a twenty-pound lifting limitation, a sit/stand option, no prolonged sitting or standing, and no repeated bending or stooping.

---

[30] Sedentary work is defined as work involving lifting no more than ten pounds and generally require six hours of sitting in an eight-hour day and may also require a certain amount of walking and standing. *See* 20 C.F.R. § 404.1567(a).
Sedentary work limitation.

23

(R.43-44). Exertionally more restrictive than those stated by the nurse practitioner at Hess Orthopaedic in January 2005 (R.367) and consistent with those outlined by the state agency physician (R.203-207), the ALJ's second hypothetical added further assumptions which included a ten-pound limitation on lifting an ability to stand or walk for a total of only two hours during the work day, and ability to sit for no more than six hours during the work day, and only occasional climbing, balancing, stooping, kneeling, crouching, or crawling. (R.45).

The plaintiff argues that this second hypothetical question "fail[ed] to take into account the ramifications" of Dr. Kime's February 2005 orthopaedic evaluation. Specifically it is her contention that Dr. Kime's evaluation demonstrated (what she describes as) a need for "rather extensive surgery" which, by implication, was both inconsistent with the types of work activity identified by the vocational witness and with the ALJ's discount of her pain-related testimony.

This argument fundamentally misunderstands both the role of a vocational witness and the descriptive quality of hypothetical questions. Although a hypothetical question posed to a vocational witness "must set forth all of the [plaintiff's] impairments, . . . it need not use specific diagnostic terms where other descriptive terms can adequately define the [plaintiff's] impairments." *Roe v. Chater*, 92 F. 3d 672, 676 (8th Cir. 1996). And the vocational testimony elicited pursuant to such a descriptive hypothetical question is the purpose of establishing the physical and mental demands of different types of work and whether specific jobs he identified exist in significant numbers in the economy. *See* 20 C.F.R. §§ 404.1560, 404.1566.

24

As previously outlined, before making his functional capacity determination, the ALJ assessed the plaintiff's credibility in accordance with *Craig* and the applicable regulations. He determined that she had a number of vocationally significant exertional limitations. He determined that she could not return to any of her past relevant work. His hypothetical question fairly described the plaintiff's demonstrated exertional limitations. It was based on substantial evidence in the record, and as posed to the vocational witness, the question was properly-phrased. The opinion of the vocational witness that the plaintiff could perform certain identified work in the national economy was, therefore, appropriately supported by substantial evidence and properly adopted by the ALJ.

## V.       Proposed Findings of Fact

As supplemented by the above summary and analysis and on the basis of a careful examination of the full administrative record, the undersigned submits the following formal findings, conclusions and recommendations:

1. Plaintiff's claim that the ALJ failed to consider properly the medical evidence is not supported by the administrative record;

2. Plaintiff's claim that the ALJ relied on vocational testimony given in response to an incomplete hypothetical question is not supported by the administrative record;

3. The ALJ acted within his decisional authority to discount plaintiff's statements concerning the degree to which she was exertionally impaired because of persistent low back pain;

4. Substantial medical and activity evidence exists to support the ALJ's finding that plaintiff's evidence regarding the severity of her symptoms and functional limitations was not entirely credible;

5.    The ALJ adequately considered all of the evidence in this case, including plaintiff's testimony and treating source medical opinions;

6.    Substantial evidence exists to support the ALJ's finding that plaintiff is not disabled within the meaning of the Social Security Act;

7.    Substantial evidence exists to support the ALJ's finding that plaintiff retains the residual function capacity to perform a limited range of sedentary work;

8.    The plaintiff has not met her burden of proving disability; and

9.    The final decision of the Commissioner is supported by substantial evidence and should be affirmed.

## VI.    Recommended Disposition

For the foregoing reasons, it is RECOMMENDED that an order enter DENYING the plaintiff's motion for summary judgment, GRANTING the defendant's motion for summary judgment, and DISMISSING this case from the docket WITH PREJUDICE to the plaintiff.

The clerk is directed to transmit the record in this case immediately to the presiding United States District Judge.

## VII.    Notice to the Parties

Both sides are reminded that, pursuant to Rule 72(b) of the Federal Rules of Civil Procedure, they are entitled to note objections, if any they may have, to this Report and Recommendation within ten (10) days hereof.  **Any adjudication of fact or conclusion of law rendered herein by the undersigned to which an objection is not specifically made within the period prescribed by law may become conclusive upon the parties.**  Failure to file specific objections pursuant to 28 U.S.C.

26

§ 636(b)(1) as to factual recitals or findings as well as to the conclusions reached by the undersigned may be construed by any reviewing court as a waiver of such objections.

The clerk is directed to transmit copy of this Report and Recommendation to all counsel of record.

DATED: 24th day of May 2006.

_____
United States Magistrate Judge

Case 5:05-cv-00065-SGW-JGW   Document 13   Filed 05/25/06   Page 27 of 27   Pageid#: 70